# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No._____ |
| | : |
| RIDER UNIVERSITY, | : **Jury Trial Demanded** |
| | : |
| Defendant. | : |
| | : |
| | : |

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe ("John" or "John Doe"), by and through his undersigned attorneys, files this Complaint and, in support thereof, alleges as follows:

## I.  NATURE OF THE ACTION

1. On October 17, 2015, John was a freshman in good standing at Rider University ("Rider" or "University").  On October 18, Jane Roe ("Jane Roe") and Jane Roe 2 ("Jane Roe 2") falsely accused John of a sexual assault that never happened.  Rather than investigating Jane Roe's and Jane Roe 2's allegations, the University blindly accepted them.  In a rush to convict John and brand him a sexual predator, Rider immediately—and without any investigation— suspended John from the University.  In the weeks and months that followed, while John was forced to sit at home, he was subjected to a Title IX disciplinary process that was unabashedly pro-complainant, refused to afford him any semblance of fundamental fairness, and considered him guilty until proven innocent.  On information and belief, a high-level administrator at Rider described the University's Title IX disciplinary process as replete with "due-process flaws."  It is.  But John was not merely the victim of a flawed process.  He was the victim of a University

that actively ignored its own Title IX disciplinary process—a process detailed in two student handbooks—whenever necessary to disadvantage and convict him.  And he was the victim of Associate Vice President for Student Affairs, Dean Anthony Campbell, who as early as October 19, refused to hear John's account and announced, based on Jane Roe's and Jane Roe 2's allegations alone, "I'm going against you."  Rider made good on Dean Campbell's promise, and did so from the start.

2.      While John was suspended and forbidden from continuing his coursework, Rider did nothing.  No witnesses were interviewed.  No investigation was conducted.  The University, through its outside counsel, claimed that the Mercer County Prosecutor's Office requested that the University put its disciplinary investigation on hold while the Prosecutor's Office conducted its investigation.  That representation was false.

3.      In mid-November, the Mercer County Prosecutor's Office declined to prosecute John.  While the Prosecutor's Office did not disclose the reasons underlying its decision, presumably the decision was based on the inconsistent statements made by Jane Roe and Jane Roe 2, whose stories not only defied commonsense, but were constantly shifting.

4.      But even after Mercer County refused to prosecute John, Rider and Dean Campbell continued the suspension they had imposed upon him.  While John was forced to sit at home, the University conducted the most perfunctory of investigations.  What little investigation the University did conduct focused on inculpatory facts only, while assiduously avoiding the exculpatory.

5.      The result of the University's investigation was a one-page letter charging John with sexual assault and warning him that if found "responsible," he faced punishment up to expulsion.  The letter included no description of the alleged facts underlying the sexual assault

2

charge.  There was no complaint or anything akin to a formal charging instrument.  Instead, John was left to guess at the facts that could end his academic career at Rider.  John repeatedly asked the University for more information on the charges against him, but the University was content to let him guess.

6.     On December 4, 2015, the University and Dean Campbell assembled a hearing panel, consisting of three members, to judge the evidence against John.  All three panel members were administrators who reported directly or, through others, to Dean Campbell.  John raised the clear conflict of interest with the University—after all, it was Dean Campbell who had originally declared he was "going against" John, suspended him, and continued that suspension even after the Mercer County Prosecutor's Office declined prosecution—and sought the panel members' recusals.  Rider denied John's request and allowed the hearing to proceed.

7.     Prior to and then again at the disciplinary hearing, John asked for all medical reports or other medical evidence detailing Jane Roe's purported injuries.  Rider denied John's request prior to the hearing and, at the hearing, the panel members quickly shutdown all questions concerning Jane Roe's medical treatment.

8.     But in the waning minutes of the hearing, the hearing panel allowed Jane Roe to testify about her medical treatment.  She declared, without any support, that the results demonstrated she was the victim of a sexual assault.  She did not state who made that finding or based on what evidence.  She did not even specify the nature of the alleged sexual assault.  Of course, Jane Roe's alleged results went unrebutted because the panel members had barred all questions about Jane Roe's medical treatment.

9.     On December 8, 2015, in another one-page letter, John was found responsible by the hearing panel and expelled from the University.  There was no written opinion from the panel

explaining its decision or the punishment imposed.  There were no findings of fact.  There was no explanation about whom the panel judged credible and whom it judged incredible.  There was nothing beyond two words: "responsible" and "expulsion."  At the beginning of this rigged process, John was left to guess at what he had been charged with.  Now, he was left to guess at why he had been found responsible, and his college career ended only months after it had begun.

10.     John appealed the hearing panel's decision, but with no written opinion to appeal, he did so blindly.  On January 8, 2016, in yet another one-page letter, a separate appeal panel upheld the original hearing panel's responsibility finding and chosen punishment.

11.     John's academic career at Rider was over.  But beyond that, his education record has been permanently marred because he has effectively been branded as a sexual predator, making admission to another college or university of similar caliber to Rider likely impossible.

12.     John will be stigmatized for years to come by the fact that he was found responsible for sexual assault.  He will have no choice but to disclose the finding whenever he is asked whether he was the subject of a college disciplinary proceeding or found responsible for a disciplinary violation, a common question in transfer applications to other colleges or for graduate or professional school, in professional licensure applications, in government employment applications, and in other employment or prospective employment circumstances.

13.     Besides the irreversible damage to his college transfer, post-graduate, employment, and earning prospects, the University's finding of responsibility for sexual assault has lasting social and reputational harm.  The University's labeling of John as a "sexual predator" will continue to have dramatic, life-altering consequences for him.

14.     Rider's conduct has caused John severe emotional and physical distress, including panic attacks, loss of appetite, an inability to sleep through the night, nightmares, and anxiety, all requiring counseling.

15.     For these reasons, John brings this action to obtain injunctive and declaratory relief and monetary damages based on causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New Jersey's Consumer Fraud Act, promissory estoppel and reliance, negligence, intentional infliction of emotional distress, and violation of Title IX of the Education Amendments of 1972, all based on a disciplinary process that can only be labeled fundamentally unfair.

## II.     PARTIES

16.     Plaintiff John Doe is a resident of Passaic County, New Jersey.  During the 2015-2016 academic year, John was enrolled as a fulltime freshman at Rider.  He was scheduled to graduate in June 2019.

17.     Defendant Rider University is a private university located in Mercer County, New Jersey offering undergraduate and graduate degrees to approximately 5,000 students across 67 undergraduate and 35 graduate degree programs.

## III.     JURISDICTION AND VENUE

18.     This Court has original jurisdiction over Count VII pursuant to 28 U.S.C. § 1331 because John's Title IX claim arises under the laws of the United States.  This Court has supplemental jurisdiction over Counts I through VI and VIII pursuant to 28 U.S.C. § 1367 because those claims are so related to John Doe's Title IX claim that they form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to John's claims occurred in this district.  Among other things, the alleged sexual assault occurred in this district, and the resulting disciplinary process unfolded here.

## IV.     FACTUAL BACKGROUND

### A.     The Alleged Sexual Assault

20.     In the early morning hours of October 18, 2015, John returned to campus with three friends from an off-campus party.  John was the designated driver that night, and was not intoxicated.  Upon entering Poyda Residence Hall, some of the boys entered the boys' restroom.  It was there that John first encountered Jane Roe and Jane Roe 2 who were, for some reason, in the boys' restroom.  Mindful of the girls, and slightly embarrassed, John went to the point furthest from the girls to use the bathroom.

21.     Two of John's friends finished in the restroom and went to bed.  When John left the restroom, he found his remaining friend, Joe Doe ("Joe Doe"), speaking with Jane Roe and Jane Roe 2.  John joined the conversation.  Although neither John nor Joe Doe knew Jane Roe and Jane Roe 2, all four were freshmen at Rider and easily engaged in several minutes of conversation, discussing, among other things, where they were from, where they lived at Rider, coursework, and athletics.

22.     While it was clear that both Jane Roe and Jane Roe 2 had been drinking, it was equally clear that neither was incapacitated.  Both were able to carry on a conversation, were coherent, were not slurring their words or in need of assistance to stand, and were otherwise in full command of their faculties.  In fact, of the four, it was Joe Doe who, upon information and belief, may have been incapacitated because of how much he had had to drink that evening.

23.     After conversing for several minutes, John and Joe Doe asked Jane Roe and Jane Roe 2 if they wanted to return to Joe Doe's dormitory room. Both girls readily agreed. The four walked down the hallway from the boys' restroom to Joe Doe's dormitory room; Jane Roe and Jane Roe 2 walked to the room willingly, and without assistance, prodding, or coercion of any sort.

24.     Upon entering the dormitory room, Jane Roe 2 and Joe Doe went to Joe Doe's bed, and Jane Roe and John went to Joe Doe's roommate's bed (Joe Doe's roommate was absent for the weekend). The lights were off, and the room was dark. Upon information and belief, Jane Roe 2 and Joe Doe engaged in consensual kissing and light touching for approximately 10 minutes until Joe Doe passed out from his alcohol intake, and Jane Roe 2 left the dormitory room.

25.     Jane Roe and John likewise engaged in consensual kissing and light touching. Throughout the encounter, John remained fully clothed, including wearing his sneakers. Jane Roe was also fully clothed until Jane Roe 2 left the room, at which time Jane Roe, on her own and voluntarily, removed her blouse and bra. The entire encounter lasted no more than 20 minutes and progressed no further than John touching Jane Roe's breasts and Jane Roe rubbing her hands over John's genitals over his pants. John also sucked on Jane Roe's lips and neck, leaving her with a hickey. Importantly, for most of the encounter, Jane Roe was on top of John.

26.     Equally important, in both words and actions, Jane Roe at all times indicated a willingness to engage in kissing and sexually explicit touching with John. In fact, she indicated a willingness to do more, telling John at the beginning of their encounter that they could not have sexual intercourse because she had her period even though John neither asked nor wanted to have intercourse with Jane Roe.

27.     The encounter came to an end when Jane Roe and John were interrupted by banging on the dormitory room door and several voices shouting, "Jane."  Upon hearing the knocking and voices at the door, Jane Roe put her bra and blouse back on in the dark room, opened the door, and rejoined her friends.

**B.      Public Safety Conducts Preliminary Interviews**

28.     Upon information and belief, when Jane Roe rejoined her friends, they noticed that her blouse was on backwards, and there was a hickey on her neck.  At least one of her friends believed that the backwards blouse and hickey indicated a non-consensual encounter. Indeed, one of Jane Roe's male friends confronted John and asked him what he had done to Jane Roe.  John responded that he had not forced Jane Roe to do anything and that his encounter with Jane Roe was voluntary and consensual.

29.     Following that exchange, John closed the door and went to bed.

30.     Two hours later, at approximately 5:00 a.m., John was awoken by Public Safety. He was told that the officers were investigating a sexual assault and that they needed John to accompany them to the Public Safety building to provide a written statement.  John complied.

31.     Upon information and belief, between the time Jane Roe left Joe Doe's dormitory room and the time John was awoken by Public Safety, Jane Roe's friends convinced Jane Roe that she was the victim of a sexual assault, and she should report the incident to University officials.  Upon information and belief, but for her friends' persistent and misguided prodding, Jane Roe would not have reported her consensual encounter with John to Public Safety.

32.     At the Public Safety building, John was not told anything about the nature of Jane Roe's allegations, but he provided officers with a written statement nonetheless.  That statement acknowledged that Jane Roe had been drinking, but made clear that John's encounter with Jane

Roe was at all times consensual.  John's statement was also explicit in stating that he and Jane

Roe never progressed beyond kissing and touching; there was no penetrative sexual activity

between the two, no oral sex, and no attempted oral sex.

33.     Public Safety also instructed Joe Doe to provide a written statement.  His

statement was consistent with John's.

34.     More significantly, John's statement—without knowing what Jane Roe had

alleged—was consistent with what Jane Roe initially told Public Safety.

35.     Prior to interviewing John, at approximately 4:52 a.m., two Public Safety officers

had interviewed Jane Roe.  During that interview, she stated that "she did not believe that the

acts performed [between her and John] involved either her, or John['s] genitals."  Later, at

approximately 6:53 a.m., Jane Roe reaffirmed that statement to Public Safety.  Specifically, she

was asked, "When you say things got sexual, what exactly took place?"  Jane Roe responded,

"There was kissing and touching involved.  John began to unzip my pants[,] and I stopped him

several times [when] this occurred.  It wasn't until the RA threat that he completely stopped."

36.     In that same statement at 6:53 a.m., Jane Roe admitted that she "insisted on

staying" with John even after Jane Roe 2 left Joe Doe.  Jane Roe also stated that while she did

not give "100% consent to the situation," she "did not fully deny it" either.

37.     Jane Roe 2 was likewise twice interviewed by Public Safety officers in the early

morning hours of October 18.  Her statements were internally contradictory and defied

commonsense.  On the one hand, she described the dormitory room as "very dark," but on the

other claimed she witnessed John "violent[ly] touching" Jane Roe.  And despite this supposed

"violent touching," Jane Roe 2 left the dormitory room without Jane Roe or trying to get Jane

Roe to come with her.

38.     Importantly, in neither statement did Jane Roe 2 allege sexual contact between her and Joe Doe, much less a sexual assault.

### C.     Hours Later, Jane Roe And Jane Roe 2 Tell The Lawrence Township Police Department Wildly Different Stories From What They Earlier Told Public Safety

39.     Upon information and belief, sometime in the afternoon of October 18, Jane Roe and Jane Roe 2, along with their parents, met with Dean Anthony Campbell.  During that meeting, Dean Campbell saw the hickey on Jane Roe's neck and said the bruise was more consistent with an assault than a hickey.  He urged Jane Roe and Jane Roe 2 to file a report with the Lawrence Township Police Department.

40.     Jane Roe and Jane Roe 2 complied.  And when they filed their reports with the Police Department during the late evening hours of October 18, they recounted stories for law enforcement officers dramatically different from those they had twice shared with Public Safety just hours earlier and before they had time to speak with one another, their parents, or Dean Campbell.

41.     Jane Roe changed her story about her encounter with John.  Her new story was directly opposed to what she had twice told Public Safety closer in time to the alleged incident. For the first time, Jane Roe claimed that John "forcibly push[ed] her head down and plac[ed] his penis in her mouth."  Previously, Jane Roe had told Public Safety that "she did not believe that the acts performed [between her and John] involved either her, or John['s] genitals."

42.     Jane Roe 2 likewise manufactured new "facts."  For the first time, she claimed that she was the victim of a sexual assault.  Specifically, Jane Roe 2 claimed that Joe Doe had digitally penetrated her vagina and rubbed her breasts.  For the first time, she claimed that she had seen John pushing Jane Roe's head into his groin area.  And for the first time, she claimed

that she had to force her way out of the dormitory room; previously, Jane Roe 2 said she had simply left the room.

43.     Based on Jane Roe's and Jane Roe 2's statements, on October 19, 2015, Dean Campbell suspended John from the University for sexual assault.  Shortly thereafter, Joe Doe was suspended from the University for the same charge.

44.     The University took those actions before either law enforcement officers or University officials had any opportunity to prove or disprove Jane Roe's and Jane Roe 2's allegations and before John and Joe Doe had a chance to rebut those allegations and present their case pursuant to the University's Anti-Harassment and Non-Discrimination Policy ("Policy")—a Policy that entitles students charged with sexual misconduct to certain rights and protections. This was merely the first instance of several of the University violating both the letter and spirit of its own Policy during the investigation and prosecution of John.

**D.     Rider And Dean Campbell Repeatedly Violate The University's Anti-Harassment And Non-Discrimination Policy, As Well As The Source, In The Lead-up To The Formal Hearing**

45.     Whenever there is an allegation of sexual misconduct on Rider's campus, the investigation and, if necessary, adjudication of that allegation is governed by the Policy.  John was provided with a copy of the Policy at the time of his suspension and was told—repeatedly throughout the process—that Rider would abide by the Policy and afford him all of the rights and protections included therein.  John relied on those representations and promises.

46.     John was also provided with a copy of Rider's student handbook, The Source, at the time of his suspension and was told—then and repeatedly throughout the process—that Rider would abide by The Source and afford him all of the rights and protections included therein. John relied on those representations and promises.

47.     The Policy begins with the following commitment in the form of a letter to the community from Robert Stoto, the University's Title IX Coordinator: "All students, faculty, administrators and staff at the University have the right to expect an environment that allows them to enjoy the full benefits of their work or learning experience."  (Policy at 1, attached hereto as Exhibit A).

48.     John, however, was denied that environment; as set forth more fully below, the University repeatedly ignored and violated the Policy, as well as The Source, during its investigation and adjudication of John for sexual assault.  Those violations, both separately and in the aggregate, created a fundamentally unfair process that adjudged John guilty from the very first and stripped him of his ability to adequately defend himself and demonstrate his innocence.

49.     Rider's first violation was of The Source.  (Relevant pages of The Source are attached hereto as Exhibit B).  According to The Source, "Within five academic days of the invocation of [an interim] suspension, a community standards panel must determine whether grounds still exist to warrant its continuation."  (Ex. B at 89).  The purpose of the community standards panel, composed of administrators and students, is to determine whether the interim suspension imposed by the University should be maintained, revoked, or modified.  Of course, to fulfill its obligations, the community standards panel must be independent of and serve as a check on the University and the decision-maker who imposed the interim suspension.

50.     Dean Campbell suspended John on October 19.  Pursuant to The Source, a community standards panel was empaneled to review Dean Campbell's interim suspension order.  John presented his case before the community standards panel, and was thereafter excused so the panel could conduct its deliberations.

51.     The room that John and his parents were excused to was in the Vice President for Student Affairs' office suite.  During the time the community standards panel was purportedly deliberating, John and his parents witnessed the chairwoman of the panel having discussions with Dean Campbell.  While neither John nor his parents could hear those discussions, upon information and belief, the chairwoman of the panel was discussing John's case and the interim suspension with the Dean.  Such discussions were a clear violation of The Source and the community standards panel's obligation and function to be an independent check on Dean Campbell.

52.     The community standards panel upheld and continued the interim suspension.

53.     In the weeks following the community standards panel's decision to uphold John's interim suspension, Rider purported to conduct an investigation of Jane Roe's and Jane Roe 2's allegations consistent with the Policy.  Instead, the University's investigation deviated from the Policy in a number of material ways—all detrimental to John Doe.

54.     The Policy requires "a trained investigator or investigators to promptly, fairly and impartially investigate the complaint."  (Ex. A at 18).  One of the officers assigned by the University to investigate Jane Roe's complaint was Detective William Eggert of Rider's Public Safety Office.  Detective Eggert was neither fair nor impartial.

55.     Detective Eggert assembled a summary affidavit detailing Jane Roe's and Jane Roe 2's allegations.  The affidavit parroted Jane Roe's and Jane Roe 2's statements to the Lawrence Township Police Department and completely ignored the girls' earlier—and contradictory—statements to Public Safety, the office out of which Detective Eggert himself works.  Detective Eggert made no attempt to be complete, let alone impartial.  He simply

accepted wholesale Jane Roe's and Jane Roe 2's revised and changed statements without exercising a critical or inquiring eye.

56. Detective Eggert and officials likewise failed to take the investigative steps required by the Policy. According to the Policy, "In the case of sexual violence, a sexual assault response team (SART) will be activated by the hospital should a victim seek medical attention and/or wish to have evidence collected. A specially trained sexual assault nurse examiner (SANE) will respond as part of the team to perform the examination. The evidence will be secured whether or not a victim decides to pursue criminal prosecution." (*Id.* at 10).

57. Jane Roe alleged that she was the victim of a sexual assault. John requested from the University all evidence secured by the SART and SANE; John was told that none existed. Detective Eggert's and the University's failure to abide by the Policy and activate a SART and SANE in response to Jane Roe's allegations of sexual assault impeded John's ability to challenge Jane Roe's allegations or otherwise impeach Jane Roe's and Jane Roe 2's credibility.

58. But while the University demonstrated its bias against John, a male respondent, through its investigation of—or failure to thoroughly investigate—Jane Roe's and Jane Roe 2's allegations, clearer evidence came through the words of University officials themselves. First, there was Dean Campbell's statement on October 19 that he was "going against" John.

59. That was followed by a November 19 e-mail from Rider's outside counsel to John's counsel. That e-mail, written while the University's investigation was ongoing, and weeks before the formal hearing to consider John's guilt or innocence was convened, asserted:

> We … have statements from those involved in the incident (including your client) that reveal your client and another student encountered two female students, who no one disputes, were under the influence of alcohol. Also undisputed are the facts that your client and the other male student met these female students for the first time on the evening/morning in question and within minutes

of meeting them, proceeded to take the two female students back to a dorm room.  Once in the room, and again undisputed, the room was dark and your client and the other male student separated the female students and took them to separate beds.  Because an individual that is under the influence of alcohol cannot give consent, any activity that occurred in the dorm room, was non-consensual. … I am not deciding this case, but the above facts reveal [that the interim suspension of John was supported by sufficient evidence].

I also want to respond to your contention that the two female students are not credible because they have inconsistent statements.  There are numerous articles/studies that reveal that it is not unusual – and indeed typical – for sexual assault victims to give inconsistent statements.  While your client is free to point out the inconsistencies, he (and you) should be aware that there is a contrary view.

60.    While the University's attorney was careful to say that he was "not deciding the case," he did just that in the immediately preceding sentence, declaring that "any activity that occurred in the dorm room[] was non-consensual."

61.    The attorney reached this conclusion before the University's investigation was concluded, before any formal hearing was convened, and before John ever had the opportunity to present his full version of the night's events or confront Jane Roe or Jane Roe 2.

62.    More troubling, the attorney reached this conclusion by misconstruing the Policy.  The Policy does not state that a person "under the influence of alcohol" cannot give consent.  Rather, the Policy says that an incapacitated student cannot give consent.  (*Id.* at 4) ("A person who is asleep or mentally or physically incapacitated, whether due to the effect of drugs or alcohol, or for any other reason, is not capable of giving valid consent.").  There was absolutely no evidence proffered on or before November 19—or after—indicating that Jane Roe was incapacitated at the time of her encounter with John.

15

63.     This rush to believe Jane Roe—a female—to the detriment of John Doe—a male—was fundamentally unfair, but not surprising given the bias Rider exhibited in favor of Jane Roe and against John Doe throughout the disciplinary process.  Indeed, Rider has made explicit where its sympathies lie in instances of alleged sexual assault.  On its webpage titled "Sexual Assault," Rider gives the following advice about how to help a friend who has been sexually assaulted: "BELIEVE the survivor."  (*See* http://www.rider.edu/student-life/health-wellness/counseling-services/sexual-assault) (emphasis in original).

**E.     Rider And Dean Campbell Continue To Violate The University's Anti-Harassment And Non-Discrimination Policy During The Disciplinary Hearing**

64.     In the weeks following November 19, the University continued with its investigation.  Upon information and belief, the University did so to make it appear as if the University was adhering to the Policy and had not pre-judged John responsible for sexual assault when, in fact, the University had.

65.     The result of the University's "investigation" was a one-page letter charging John with sexual assault and advising him that his punishment could include expulsion from the University.  A formal hearing before a three-person Student Anti-Harassment and Non-Discrimination Board ("Board") was set for December 4.

66.     The empanelment of the Board and the hearing process is governed by the Policy.

67.     According to the Policy, "[T]he Board's procedures are designed to ensure due process for the complainant and respondent…."  (Ex. A at 21).  The University violated this mandate from the start.

68.     The Policy defines "sexual assault" broadly.  According to the Policy, a sexual assault "occurs when an unwelcomed physical contact of a sexual nature is intentional and is

committed either by (a) physical force, violence, threat, or intimidation; (b) ignoring the objections of another person; (c) causing another's intoxication or impairment through the use of drugs or alcohol; or (d) taking advantage of another person's incapacitation, state of intimidation, helplessness, or other inability to provide consent."  (*Id.* at 5).

69.     The one-page letter charging John failed to identify what subsection or subsections of the sexual assault definition John had allegedly violated.  It was unclear if the charge was premised on the hickey on Jane Roe's neck, the oral sex allegation, Jane Roe's alleged incapacitation from alcohol, or something else.  Several times, both in writing and orally, John asked the University to clarify its theory of the charge so he could prepare his defense and secure his right to a fair process guaranteed by the Policy.  Each time, the University refused.

70.     As a result, John did not have adequate notice of the alleged facts supporting the alleged Policy violation or of what aspect of the sexual assault provision he was alleged to have violated.

71.     Without adequate notice of the facts and allegations supporting the alleged Policy violation, John was unfairly hindered in his efforts to defend himself against Jane Roe's accusations.

72.     Additionally, the University refused John's request for a fair and impartial Board.

73.     According to the Policy, "The Board will be composed of three (3) impartial and trained, professional staff members of the community appointed by the Title IX Coordinator (or designee)."  (*Id.* at 21).

74.     Just days before the December 4 formal hearing, John learned that the three designated Board members all reported, either directly or through others, to Dean Campbell.  This was a clear conflict of interest.  It was Dean Campbell who had urged Jane Roe and Jane

Roe 2 to make a report to the Lawrence Township Police.  It was Dean Campbell who had suspended John on October 19, 2015.  It was Dean Campbell who had summarily declared that he was "going against" John.  And, on information and belief, it was Dean Campbell who had directed the community standards panel to continue John's interim suspension.

75.     Additionally, it was Dean Campbell who had actively impeded John's efforts to continue his coursework notwithstanding the interim suspension.  Pursuant to the Policy, John made an appeal to the University and Dean Campbell for academic support during his interim suspension, (*see id.* at 11), but the University and Dean Campbell refused.

76.     Despite this clear conflict of interest, the University failed to recuse any of the Board members.

77.     As feared, the Board members' bias quickly became evident.

78.     The Board vigorously and aggressively questioned John, while delicately questioning Jane Roe, Jane Roe 2, and their witnesses.

79.     Prior to and again at the formal hearing, John had requested all medical records from Jane Roe.  Jane Roe and the University failed to provide John with the requested records.

80.     According to the Policy, "In the absence of good cause as determined by the Board Chair in their [sic] sole discretion, the complainant and respondent may not introduce witnesses, documents, or other evidence at the hearing that were not timely provided to the Board Chair as set forth above."  (*Id.* at 21-22).  But the Board was content to ignore this directive, and allowed Jane Roe to provide verbal testimony of the results of her medical treatment.  According to Jane Roe, those results showed that she was the victim of a sexual assault.

81.     When John attempted to question Jane Roe about her medical records, the Board quickly and abruptly blocked the questioning.  This was a clear violation of the Policy.

82.     According to the Policy, "The Board Chair is empowered to disallow any questions that are irrelevant or redundant."  (*Id.* at 23).  John's questions about Jane Roe's medical records and treatment were neither irrelevant nor redundant, particularly when the Board invited those questions by ignoring the Policy in favor of Jane Roe and allowing her to enter evidence about her medical treatment that was never provided to John and which he was not allowed to rebut or challenge in any way.

83.     Such actions were fundamentally unfair and denied John the "due process" the Policy promised.

84.     On December 8, 2015, in a one-page letter, the Board found John responsible for sexual assault and expelled him from the University.  There was no written opinion or basis for the Board's decision.  Just as John was left to guess at what he had been charged with, he was left to guess at why he had been found responsible and based on what alleged conduct.

85.     John appealed the Board's decision, but without an opinion or other decision to challenge, he was forced to guess at the basis for the decision.

86.     On January 8, 2016, the University rendered its decision on the appeal.  "Responsible."  "Expulsion."  Consistent with everything that came before, the University delivered its decision in a one-page letter.

87.     In every substantive phase of the disciplinary proceedings in John's case, Rider University committed material breaches of its written policies and procedures, which adversely impacted the outcome of the case and resulted in a fundamentally unfair disciplinary process.

**F.     Rider Continues To Violate Its Contractual Obligations And Duties Under The Family Educational Rights And Privacy Act ("FERPA") Due To Its Refusal To Provide John With The Audio Recordings Of The Disciplinary Hearing**

88.     Promptly following the conclusion of the disciplinary hearing and appeal, John, through his attorney, made several requests, both orally and in writing, for copies of the audio recordings of his disciplinary hearing, which are part of his educational record.

89.     In response to John's several requests, the University's attorney assured John's attorney that copies of the audio recordings would be promptly provided.  They never were, nor was John ever invited by the University to make an appointment to listen to the audio recordings on Rider's campus.  Months later, John is still without the audio recordings of his own disciplinary hearing.

90.     The University's continued refusal to provide John with copies of the audio recordings is a violation of the University's obligations as outlined in The Source.  (Ex. B at 72-73) ("Students who want to inspect and review their records may make an appointment with the Dean of Students or his/her designee, Bart Luedeke Center, Students Affairs Suite, on the Lawrenceville campus…. Copies of information contained in a student's own file may be requested, in writing, and will generally be released only if failure to do so would effectively prevent a student from reviewing his/her records.").

91.     The University's continued refusal to provide John with copies of the audio recordings is also a violation of the University's acknowledged obligations under FERPA.  On the University's own website, under a link entitled "FERPA Resources," the University acknowledges that pursuant to FERPA, "College students must be permitted to inspect their own education records."  (*See also* Ex. B at 73) (discussing a student's right to access his or her education records in accordance with FERPA).

92.     Perhaps most importantly, the University's refusal to provide John with copies of the audio recordings has inhibited John's ability to meaningfully consult with his attorneys, prepare this Complaint, and, ultimately, vindicate his rights.

### G.     The False Accusations Leveled Against John, And Rider's Uncritical Embrace Of Those Allegations, Has Left John Emotionally Scarred

93.     Rider University's Title IX disciplinary process is fundamentally flawed.  While it claims fairness for both complainant and respondent, it is concerned with the complainant alone. Dr. James Castagnera, Esq., Rider's Associate Provost/Legal Counsel for Academic Affairs and one of the members on John's appeal panel, made this very point in his blog.

94.     On information and belief, Dr. Castagnera quoted a Rider administrator in his blog speaking about the University's Title IX process.  According to Dr. Castagnera, the administrator said, "In order to remedy the lack of quick and effective resolution of sexual assault cases in our courts, the Department of Education wants colleges and universities to do what the justice system can't … by lowering the standard of proof from 'beyond a reasonable doubt' to 'more likely than not,' and requiring that sexual-assault investigations plus adjudications be completed in 60 days."

95.     Dr. Castagnera continued, "As I discovered earlier this year, when I dared, during supervisory training at a university, to criticize the due-process flaws in the campus-based system imposed by the DOE on sexual-assault investigations/adjudications, the attack dogs remain ready to slip their leashes against anyone with the temerity to come out openly against this latest American domestic 'war.'"

96.     On information and belief, Dr. Castagnera was writing about Rider University.

97.     Dr. Castagnera's comments are clear in their message and chilling in their import. According to Dr. Castagnera, Rider University has created a disciplinary process designed to

remedy perceived flaws in the criminal justice system at the expense of fundamental fairness. And anyone foolish enough to make that observation—that Rider has created a process that is designed to, at all times, believe and support female complainants over male respondents—is summarily "leash[ed]."

98.     The "due-process flaws" that Dr. Castagnera wrote about were lived—for months—by John.  He lives them still today.  As a result of the University's uncritical and unquestioning embrace of Jane Roe's and Jane Roe 2's allegations, and the University's flawed Title IX disciplinary process, John has experienced significant emotional and psychological scarring.

99.     Following imposition of the interim suspension on October 19, John locked himself away in his parents' home.  Depressed, he sought professional counseling.  He continues to receive treatment today.

100.    And John's wrongful accusation and expulsion has had real and visible health effects on John.  He has had wild fluctuations in weight, suffered sleepless night after sleepless night, and had, almost on a weekly basis, severe emotional breakdowns during which neither family members nor friends was able to console him.

101.    At various points throughout the University's investigation and disciplinary process, John telephoned his parents distraught.  On several occasions, one or both of John's parents were forced to rush home for fear that John might hurt himself.

## COUNT I
### (Breach of Contract)

102.    John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

103.    At all times relevant hereto, a contractual relationship existed between John and the University through the Policy and The Source.

104.    Rider is required to act in accordance with its written policies and procedures in investigating and adjudicating reports of alleged violations of student conduct standards.

105.    Based on the aforementioned facts and circumstances, Rider materially breached its express and/or implied agreement(s) with John by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against John, and by subjecting him to a fundamentally unfair process.

106.    Rider's material breaches included without limitation the following acts or omissions:

a.    continuing John's interim suspension through a process that did not allow independent review of the initial decision to suspend;

b.    conducting an investigation that was neither fair nor impartial;

c.    failing to follow the Policy regarding gathering evidence by the SART and SANE;

d.    prejudging John's guilt from the start and continuing that judgment throughout the process;

e.    applying an inappropriate standard to the issue of Jane Roe's capacity to consent;

f.    misconstruing the appropriate standard for lack of capacity to consent to sexual activity;

g.    failing to give John proper notice of the basis of the charges against him, failing to provide the bases for a finding of responsibility, and/or failing to

23

provide in its procedures for adequate notice of charges or the bases for decisions;

h.      failing to convene an impartial and unbiased hearing Board free from conflicts of interest;

i.      failing to conduct an impartial and fair hearing by, among other things, subjecting John, the accused, to harsher questioning than that used with Jane Roe or her witnesses and allowing Jane Roe to introduce medical evidence that was not previously submitted to the Board Chair as required by the Policy;

j.      failing to properly train its hearing Board members to conduct fair and impartial hearings and deliberations with regard to sexual assault allegations; and

k.      failing to provide John with copies of the audio recordings of the disciplinary hearing to which he was entitled.

107.    John is entitled to recover damages for Rider's breach of its express and/or implied contractual obligations described above.

108.    As a direct, proximate, and foreseeable consequence of these breaches, John sustained significant damages, including, without limitation, emotional distress, physical distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

109.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

110.    John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

111.    Based on the aforementioned facts and circumstances, Rider breached and violated the covenant of good faith and fair dealing implied in the agreement(s) between the University and John by failing to abide by its own regulations and by disciplining John notwithstanding the lack of evidence in support of Jane Roe's claim of sexual assault, other than Jane Roe's threadbare and inconsistent statements.

112.    As a direct, proximate, and foreseeable consequence of these breaches, John sustained significant damages, including, without limitation, emotional distress, physical distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

113.    John is entitled to recover damages for Rider's breach of the implied covenant of good faith and fair dealing described above.

114.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III
### (New Jersey Consumer Fraud Act)

115.    John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

116.    New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, provides consumer protection by declaring as unlawful an "act, use or employment by any person of any

unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."

117.    Rider has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances:

      a.     by causing John to believe that  Rider would follow the Policy and The Source, copies of which were provided to John and are also available on Rider's website; and

      b.     by causing John to believe that if he paid tuition and fees to Rider, that Rider would uphold its obligations, covenants, and warranties to John described in the Policy and The Source.

118.    Based on the foregoing facts and circumstances, Rider engaged in unfair and/or deceptive trade practices in violation of New Jersey's Consumer Fraud Act.

119.    As a direct, proximate, and foreseeable consequence of the University's deceptive acts and practices, John sustained significant damages, including, without limitation, emotional distress, physical distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

120.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**COUNT IV**
**(Promissory Estoppel and Reliance)**

121.    John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

122.    Rider's Policy, The Source, and related materials constitute representations and promises that Rider should have reasonably expected to induce action or forbearance by John.

123.    Rider expected or should have expected John to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges or universities based on its express and implied promises that Rider would not tolerate, and John would not suffer from, a denial of his procedural rights should he be accused of a violation of the Policy.

124.    John relied to his detriment on these express and implied promises and representations made by Rider.

125.    Based on the foregoing, Rider is liable to John based on Estoppel.

126.    As a direct, proximate, and foreseeable consequence of the above conduct, John sustained significant damages, including, without limitation, emotional distress, physical distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

127.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT V
### (Negligence)

128.   John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

129.    Rider owed duties of care to John.  Such duties included, without limitation, a duty of reasonable care in the investigation, hearing, and determination of the allegations of sexual misconduct against him.

130.   Rider breached those duties by, among other things:

     a.   removing him from campus arbitrarily and without due process;

     b.   continuing John's interim suspension through a process that did not allow independent review of the initial decision to suspend;

     c.   conducting an investigation that was neither fair nor impartial;

     d.   failing to follow the Policy regarding gathering evidence by the SART and SANE;

     e.   prejudging John's guilt from the start and continuing that judgment throughout the process;

     f.   applying an inappropriate standard to the issue of Jane Roe's capacity to consent;

     g.   misconstruing the appropriate standard for lack of capacity to consent to sexual activity;

     h.   failing to give John proper notice of the basis of the charges against him, failing to provide the bases for a finding of responsibility, and/or failing to provide in its procedures for adequate notice of charges or the bases for decisions;

28

i.  failing to convene an impartial and unbiased hearing Board free from conflicts of interest;

j.  failing to conduct an impartial and fair hearing by, among other things, subjecting John, the accused, to harsher questioning than that used with Jane Roe or her witnesses and allowing Jane Roe to introduce medical evidence that was not previously submitted to the Board Chair as required by the Policy; and

k.  failing to properly train its hearing Board members to conduct fair and impartial hearings and deliberations with regard to sexual assault allegations.

131. As a direct, proximate, and foreseeable consequence of the above conduct, John sustained significant damages, including, without limitation, emotional distress, physical distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

132. As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VI
### (Intentional Infliction of Emotional Distress)

133. John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

134. Based on the foregoing facts and circumstances, Rider intentionally and/or with willful or wanton indifference to the truth, engaged in conduct to remove John from Rider without regard to the truth of the allegations made by Jane Roe and Jane Roe 2 and without

evidence in support of Jane Roe's and Jane Roe 2's claims, and otherwise intentionally inflicted emotional distress upon John.

135.    The above actions and inactions by Rider were so outrageous and utterly intolerable that they caused mental anguish and severe emotional distress to John, as well as physical harm, financial loss, humiliation, loss of reputation, and other damages.

136.    As a direct, proximate, and foreseeable consequence of the above conduct, John sustained significant damages, including, without limitation, emotional distress, physical distress, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

137.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VII
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*)**

138.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

139.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.  Rider is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

140.    Rider discriminated against John and deprived him of the benefits of its education program through its discriminatory, gender-biased implementation of its disciplinary process and by expelling him as a result of that process.

141.    Under Title IX, schools must "[a]dopt and publish grievance procedures providing for the ***prompt and equitable resolution of student . . . complaints*** alleging any action which would be prohibited by [Title IX or its regulations]."  34 C.F.R. § 106.8(b) (emphasis added).  Both the Department of Education and Department of Justice have set forth this requirement by way of regulation.  *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

142.    In 2001, the Office for Civil Rights ("OCR") of the Department of Education, the office that administratively enforces Title IX, promulgated regulations pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").  Title IX's regulations, including the 2001 Guidance, have the force and effect of law, because they affect individual rights and obligations and were the product of notice-and-comment rulemaking.

143.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable. . . ."  (*Id*. at 20)  These elements apply to private and public colleges and universities and include:

- "Notice to students . . . of the [school's] procedure;"

-  "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;" and

- "Designated and reasonably prompt timeframes for the major stages of the complaint process."

*(Id.)*.

144.     OCR's 2001 Guidance further stated that *"[a]ccording due process to both parties involved, will lead to sound and supportable decisions*."  (*Id*. at 22) (emphasis added). Title IX's "due process" requirement applies to both state and private colleges and universities. (*Id*. at 2, 22).

145.     On April 4, 2011, the OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter."  (Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Apr. 4, 2011) at n. 1, *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter")).

146.     The 2011 Dear Colleague Letter reinforced the authority and applicability of the 2001 Guidance and reaffirmed that the right to have a prompt and equitable resolution applies to *both* the accuser and the accused in cases involving allegations of sexual violence.  (*Id*. at 9) (emphasis added).

147.     The 2011 Dear Colleague Letter further expanded on the 2001 Guidance's elements of prompt and equitable resolution:

- ***Notice of the grievance procedures***.  "The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language that is appropriate to the age of the school's students, easily understood, and widely distributed."  (*Id.*).

- ***Adequate, reliable, and impartial investigation of complaints***.  At minimum, Title IX regulations require schools to: (1) "[p]rovide *equitable grievance procedures*;" (2) afford the accuser and the accused "[a]n equitable opportunity to present relevant witnesses and other evidence;" and (3) ***"[a]fford [the accuser***

*and the accused] similar and timely access to any information* that will be used at the hearing." (*Id.* at 10-11) (emphasis added).  In cases involving sexual violence, OCR also instructed schools to ensure that the fact-finder and decision-maker have "[a]dequate training or knowledge regarding sexual violence," observing that "[i]f an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner."  (*Id.* at 12, n. 30).

- *Designated and reasonably prompt time frames*.  "Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates." (*Id.*).

148.   Rider violated Title IX and demonstrated its gender bias against male students accused of sexual assault as follows without limitation:

a.   by suspending John prior to conducting an "adequate, reliable, and impartial investigation" of Jane Roe's complaint, thereby presuming his guilt from the start of the disciplinary proceeding.  (*Id*. at 9);

b.   by pre-judging John's guilt and pre-determining the finding of "responsible" from the start of the process with the pronouncement by Dean Campbell that he was "going against" John immediately after the complaint was made;

c.   by failing to explore in its investigation the inconsistencies in the several statements given by Jane Roe and Jane Roe 2, thereby giving more favorable treatment to the female complainant and her witnesses;

d.      by subjecting John to Rider's disciplinary procedures without providing him with the nature of the allegations against him, thereby impairing his ability to defend himself against the accusations;

e.      by misinterpreting and applying the wrong standard of incapacitation as it relates to consent under the Policy;

f.      by creating a Title IX disciplinary process replete with due process flaws, which encouraged administrators to believe the accuser over the accused, and "leash[ed]" any administrator who argued that the University's process was inherently biased against the male accused in favor of the female accuser; and

g.      by conducting an unfair hearing process, allowing the female complainant to present medical evidence not previously shared with John or the Board Chair prior to the hearing as required by the Policy, by not allowing John to rebut the medical "evidence" submitted by the female complainant, and by treating the female complainant and her witnesses more favorably during the hearing.

149.    Further, Rider's Policy and its application of the Policy was deliberately designed to favor the female accuser and disfavor the male accused by, among other things, eliminating from the process the most fundamental procedural safeguards for the accused set forth in Title IX.

150.    Upon information and belief, in the context of sexual assault cases, Rider's procedurally deficient process is deliberately designed to subject male students as a group to less

favorable treatment than female students because accused students in sexual assault cases are overwhelmingly, if not always, male.

151.    For instance, while the Policy calls for a normal 60-day completion time for investigations regarding sexual assault or misconduct complaints, it allows for longer periods of time "where the complainant agrees that a longer period of time would be appropriate or circumstances require it."  (Ex. A at 15).  No such right is given to the accused student to agree or not with any extensions.

152.    Additionally, if after an investigation, the University decides not to proceed with a Formal Adjudication, the complainant is allowed to appeal that decision.  (*See id.* at 19).  No such commensurate right is given to the accused student to appeal the University's decision to go forward with a Formal Adjudication.

153.    In John's case, the evidence that a forcible sexual assault occurred was ambiguous at best given the lack of objective evidence, including medical evidence.  Nevertheless, John was afforded no right to appeal the University's decision to proceed to a Formal Adjudication.

154.    The outcome of Rider's flawed proceeding against John was clearly erroneous, and was motivated on the basis of sex.  The University was on notice of, and was deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infected the process.  Rider's implementation of the Policy is motivated by and premised on archaic assumptions and stereotypical notions of the sexual behavior of male and female students—*i.e*., male students are perceived as sexual aggressors and perpetrators and female students are perceived as sexual victims.  The University's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

155.     As a direct, proximate, and foreseeable consequence of Rider's aforementioned Title IX violations, John has a gap in his record and a finding in his record that brands him a sexual predator.  John will forever have to explain this gap in his record and the disciplinary findings to potential colleges and future employers.  Further, Rider's biased and outcome-determinative process will adversely affect John's academic and career prospects, earning potential, and reputation.  He has sustained significant damages, including but not limited to, severe emotional distress, damages to his physical well-being, emotional and psychological damages, damages to his reputation, past and future economic losses, loss of educational, athletic, and professional opportunities, loss of future career prospects, and other direct and consequential damages.

156.     As a result of the foregoing, John is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VIII
### (Declaratory Judgment)

157.     John repeats and alleges each and every allegation hereinabove as if fully set forth herein.

158.      Rider has committed numerous violations of its contracts and of federal and state law.

159.     John's education and future career prospects have been severely damaged. Without appropriate redress, the record of Jane Roe's false complaint will continue to cause irreversible damages to John, with no end in sight.

160.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of John's academic and disciplinary records at Rider.

161.    By reason of the foregoing, John requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) John's disciplinary and academic records be expunged of any and all adverse findings related to the flawed disciplinary proceeding at Rider; and (ii) any record of Jane Roe's false complaint be permanently destroyed.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, John Doe, respectfully requests that this Honorable Court:

a. Order Rider University to reverse and expunge its findings of responsibility and sanction of expulsion from John's education record;

b. Order Rider to provide a Dean's Certification that shall be made available to third parties (such as educational institutions and prospective employers) certifying that Rider has reversed and expunged the findings and sanction;

c. Award John compensatory and punitive damages in an amount to be determined at trial, including without limitation, damages to John's physical well-being, emotional and psychological damages, damages to John's reputation, past and future economic losses, loss of education, athletic, and professional opportunities, loss of future career prospects, and other direct and consequential damages;

d. Award prejudgment interest;

e. Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award;

f. Grant such other and further relief that the Court deems just and proper.

*s/ Lee Vartan*

Lee Vartan, Esq.
Holland & Knight
31 West 52nd Street
New York, NY  10019
Phone:  212-513-3513/Fax:  212-385-9010
Email:  lee.vartan@hklaw.com


Patricia M. Hamill, Esq.
(PA Attorney No.  48416)
Jeannette M.  Brian, Esq.
(PA Attorney No. 66169)
Conrad O'Brien PC
1500 Market Street
Centre Square – West Tower, Suite 3900
Philadelphia, PA  19102-2100
Phone: 215-864-9600/Fax: 215-864-9620
Email:  phamill@conradobrien.com
        jbrian@conradobrien.com

Date:  August 11, 2016