NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
JOHN DOE,                              :
                                       :
                    Plaintiff,         :
          v.                           :          Civil Action No. 3:16-cv-4882-BRM-DEA
                                       :
RIDER UNIVERSITY,                      :
                                       :                    **OPINION**
                    Defendant.         :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Rider University's (the "University" or "Defendant")

Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 23.) Plaintiff

John Doe ("Plaintiff") opposes the Motion.[1] Pursuant to Federal Rule of Civil Procedure 78(b),

the Court did not hear oral argument. For the reasons set forth below, Defendant's Motion to

Dismiss is **GRANTED in part** and **DENIED in part**.

### I.    BACKGROUND

For the purposes of these motions to dismiss, the Court accepts the factual allegations in

the Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Phillips*

*v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Further, the Court also considers any

---

[1] On August 22, 2016, Plaintiff filed a Motion for Permission to Proceed under a Pseudonym. (ECF Nos. 4 and 5.) The Motion was originally terminated because the parties asked for various adjournments as they attempted to settle the matter. On February 17, 2017, the Motion for Permission to Proceed under a Pseudonym was reinstated. (ECF No. 17.) In light of Plaintiff's pending request, the Court will proceed using pseudonyms.

"document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original).

### A. The Incident Between Plaintiff and Jane Roe

Plaintiff was a freshman in good standing at the University. (Compl. (ECF No. 1 ¶ 1).) On October 18, 2015, in the early morning, Plaintiff returned to campus from an off campus party with three friends. (*Id.* ¶ 20.) He was the "designated driver that night, and was not intoxicated." (*Id.*) Upon entering Poyda Residence Hall, some of the boys went to the boys' restroom where they encountered two females, Jane Roe and Jane Roe 2. (*Id.*) Two of Plaintiff's friends finished in the restroom and went to bed. (*Id.* ¶ 21.) However, when Plaintiff left the restroom he saw his remaining friend, Joe Doe speaking with Jane Roe and Jane Roe 2, and joined the conversation. (*Id.*) Plaintiff alleges:

> While it was clear that both Jane Roe and Jane Roe 2 had been drinking, it was equally clear that neither was incapacitated. Both were able to carry on a conversation, were coherent, were not slurring their words or in need of assistance to stand, and were otherwise in full command of their faculties.

(*Id.* ¶ 22.) After several minutes of conversation, Plaintiff and Joe Doe asked Jane Roe and Jane Roe 2 if they wanted to return to Joe Doe's dormitory room, and both girls "readily agreed." (*Id.* ¶ 23.)

Upon entering the dormitory room, Jane Roe 2 and Joe Doe went to Joe Doe's bed, and Jane Roe and Plaintiff went to Joe Doe's roommate's bed. (*Id.* ¶ 24.) "The lights were off, and the room was dark." (*Id.*) Jane Roe 2 and Joe Doe engaged in "consensual kissing and light toughing for approximately 10 minutes until Joe Doe passed out from his alcohol intake, and Jane Roe 2 left the dormitory room." (*Id.*)

Likewise, Plaintiff and Jane Roe engaged in "consensual kissing and light touching." (*Id.* ¶ 25.) Throughout the encounter, Plaintiff remained fully clothed. (*Id.*) "Jane Roe was also fully clothed until Jane Roe 2 left the room, at which time Jane Roe, on her own and voluntarily, removed her blouse and bra." (*Id.*) At such time, Plaintiff touched Jane Roe's breasts; sucked on her lips and neck, leaving her with a hickey; and Jane Roe rubbed her hands over Plaintiff's genitals, over his pants. (*Id.*) "[F]or most of the encounter, Jane Roe was on top of [Plaintiff]." (*Id.*)

The entire encounter lasted approximately twenty minutes, coming to an end when Jane Roe and Plaintiff were interrupted by a banging on the dormitory room door and several voices shouting, "Jane." (*Id.* ¶ 27.) Jane Roe put her bra and blouse back on, opened the door, and rejoined her friends. (*Id.*)

### B. Public Safety's Preliminary Response

Approximately two hours later, at 5:00 a.m., Plaintiff was awoken by Public Safety Officers, who informed Plaintiff they were investigating a sexual assault and asked him to provide a written statement. (*Id.* ¶ 30.) Plaintiff complied. (*Id.*) "At the Public Safety building, [Plaintiff] was not told anything about the nature of Jane Roe's allegations, but he provided officers with a written statement nonetheless." (*Id.* ¶ 32.) In his statement he stated one of the girls was "completely intoxicated" and did not know "really what was going on." (Def.'s Department of Public Safety Statement Form (ECF No. 24-2).)[2] Joe Doe also provided a written statement, which was consistent with Plaintiff's. (ECF No. 1 ¶ 33.)

---

[2] The Court may consider Plaintiff's statement to the Department of Public Safety irrespective of it not being attached to the Complaint because it was "*explicitly relied upon* in the complaint." (ECF No. 1 ¶ 32); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (emphasis in original).

Prior to interviewing Plaintiff, the Public Safety Officers interviewed Jane Roe. (*Id.* ¶ 35.) During her interview, she stated:

> "she did not believe that the acts performed [between her and John] involved either her, or [Plaintiff's] genitals." Later, at approximately 6:53 a.m., Jane Roe reaffirmed that statement to Public Safety. Specifically, she was asked, "When you say things got sexual, what exactly took place?" Jane Roe responded, "There was kissing and touching involved. John began to unzip my pants[,] and I stopped him several times [when] this occurred. It wasn't until the RA threat that he completely stopped."
>
> [] In that same statement at 6:53 a.m., Jane Roe admitted that she "insisted on staying" with John even after Jane Roe 2 left Joe Doe. Jane Roe also stated that while she did not give "100% consent to the situation," she "did not fully deny it" either.

(*Id.* ¶¶ 35-36.) Jane Roe 2 was also interviewed. She stated the dormitory was "very dark," and that she witnessed Plaintiff "violent[ly] touching" Jane Roe. (*Id.* ¶ 37.)

### C. Reports Filed with the Lawrence Township Police Department

On October 18, 2015, after a conversation with Dean Anthony Campbell ("Dean Campbell"), Jane Roe and Jane Roe 2 reported the incident to the Lawrence Township Police Department (the "Police Department"). (*Id.* ¶ 39.) The girls stories were "dramatically different from those they had twice shared with Public Safety just hours earlier and before they had time to speak with one another, their parents, or Dean Campbell." (*Id.* ¶ 40.) Defendant admits Jane Roe "provided additional details she recalled about the incident." (ECF No. 23 at 5-6.) "For the first time, Jane Roe claimed that John 'forcibly push[ed] her head down and plac[ed] his penis in her mouth.'" (ECF No. 1 ¶ 41.) Also for the first time, Jane Roe 2 claimed she was the victim of a sexual assault, that Joe Doe had digitally penetrated her vagina and rubbed her breast, and that she had to force her way out of the dormitory room. (*Id.* ¶ 42.) Additionally, she claimed "she had seen

[Plaintiff] pushing Jane Roe's head into his groin area." (*Id.*) Based on the allegedly inconsistent statements and lack of evidence, the Prosecutor's Office declined to prosecute Plaintiff. (*Id.* ¶ 3.)

### D. Defendant's Policies and Procedures

Plaintiff was provided with a copy of the Policy and The Source, Defendant's student handbook, at the time of his suspension and was told Defendant "would abide by the Policy and afford him all of the rights and protections included therein." (*Id.* ¶¶ 45-46.) Plaintiff, in his Complaint, contends Defendant did not abide by the following portions of the Policy:

> The Policy begins with a commitment from Robert Stoto, the University's Title IX Coordinator, which states: "All students, faculty, administrators and staff at the University have the right to expect an environment that allows them to enjoy the full benefits of their work or learning experience."
>
>        . . . .
>
> The Policy requires "a trained investigator or investigators to promptly, fairly and impartially investigate the complaint."
>
>        . . . .
>
> According to the Policy, "In the case of sexual violence, a sexual assault response team (SART) will be activated by the hospital should a victim seek medical attention and/or wish to have evidence collected. A specially trained sexual assault nurse examiner (SANE) will respond as part of the team to perform the examination. The evidence will be secured whether or not a victim decides to pursue criminal prosecution."
>
>        . . . .
>
> [According to the Policy,] "A person who is asleep or mentally or physically incapacitated, whether due to the effect of drugs or alcohol, or for any other reason, is not capable of giving valid consent."
>
>        . . . .
>
> According to the Policy, "[T]he Board's procedures are designed to ensure due process for the complainant and respondent . . . ."

The Policy defines "sexual assault" broadly. According to the Policy, a sexual assault "occurs when an unwelcomed physical contact of a sexual nature is intentional and is committed either by (a) physical force, violence, threat, or intimidation; (b) ignoring the objections of another person; (c) causing another's intoxication or impairment through the use of drugs or alcohol; or (d) taking advantage of another person's incapacitation, state of intimidation, helplessness, or other inability to provide consent."

. . . .

According to the Policy, "In the absence of good cause as determined by the Board Chair in their [sic] sole discretion, the complainant and respondent may not introduce witnesses, documents, or other evidence at the hearing that were not timely provided to the Board Chair as set forth above."

. . . .

According to the Policy, "The Board Chair is empowered to disallow any questions that are irrelevant or redundant."

(*Id.* ¶¶ 47, 54, 56, 62, 67, 68, 80, and 82.) Plaintiff further contends Defendant did not abide by

the following provisions of The Source:

**Student Records**

. . . . Students who want to inspect and review their records may make an appointment with the Dean of Students of his/her designee, Bart Luedeke Center, Student Affairs Suite, on the Lawrenceville campus or the Associate Dean of Students, or his/her designee, Scheide Student Center, on the Princeton campus. Students who believe that the official records contain factual inaccuracies that have not been modified through normal channels, may apply to the Dean of Students to have the inaccuracy corrected in the records. . . . Copies of information contained in a student's own file may be requested, in writing, and will generally be released only if failure to do so would effectively prevent a student from reviewing his/her records.

. . . .

**Interim Suspension**- When immediate action is necessary to protect the health or safety of any community member or to prevent

disruption the University's learning environment, including students presenting evidence of self-harm, the president or Dean of students or his/her designee may temporarily suspend a student. . . . Within five academic days of the invocation of this suspension, a community standards panel must determine whether grounds still exist to warrant its continuation.

(The Source (Ex. B to ECF No. 1-2) at 72, 73.)

### E. Community Standards Panel and Affirmation of Interim Suspension

On October 19, 2015, Dean Campbell suspended Plaintiff from the University for sexual assault and told Plaintiff he was "going against" him. (ECF No. 1 ¶¶ 1, 6, 43, 58.) Plaintiff alleges Defendant

[t]ook those actions before either law enforcement officers or University officials had any opportunity to prove or disprove Jane Roe's and Jane Roe 2's allegations and before [Plaintiff] and Joe Doe had a chance to rebut those allegations and present their case pursuant to the University's Anti-Harassment and Non-Discrimination Policy ([the] "Policy")—a Policy that entitles students charged with sexual misconduct to certain rights and protections. This was merely the first instance of several of the University violating both the letter and spirit of its own Policy during the investigation and prosecution of [Plaintiff].

(*Id.* ¶ 44.)

Following Plaintiff's interim suspension, Defendant empaneled a community standards panel to review Dean Campbell's suspension order. (ECF No. 1 ¶ 50.) Plaintiff "presented his case before the community standards panel and was thereafter excused so the panel could conduct its deliberations." (*Id.*) The community standards panel affirmed and continued the interim suspension. (*Id.* ¶ 52.) Plaintiff alleges he witnessed the chairwoman of the panel having discussions with Dean Campbell during the community standards panel's deliberation. (*Id.* ¶ 51.)

**F. Defendant's Investigation**

In the weeks following the community standards panel's decision to uphold Plaintiff's suspension, Plaintiff alleges Defendant purported to conduct an investigation. However, the investigation was allegedly not in accordance with the Policy and was not impartial. (*Id.* ¶¶ 52-53.) Detective William Eggert ("Detective Eggert") of Defendant's Public Safety Office assembled a summary affidavit parroting Jane Roe's and Jane Roe 2's statements to the Police Department and "completely ignored the girls' earlier—and contradictory—statements to Public Safety." (*Id.* ¶ 55.)

Defendant also sent Plaintiff an e-mail, while the investigation was ongoing, which Plaintiff alleges demonstrates Defendant's impartiality. The email asserted:

> We . . . have statements from those involved in the incident (including your client) that reveal your client and another student encountered two female students, who no one disputes, were under the influence of alcohol. Also undisputed are the facts that your client and the other male student met these female students for the first time on the evening/morning in question and within minutes of meeting them, proceeded to take the two female students back to a dorm room. Once in the room, and again undisputed, the room was dark and your client and the other male student separated the female students and took them to separate beds. Because an individual that is under the influence of alcohol cannot give consent, any activity that occurred in the dorm room, was non-consensual. . . . I am not deciding this case, but the above facts reveal [that the interim suspension of [Plaintiff] was supported by sufficient evidence].
>
> I also want to respond to your contention that the two female students are not credible because they have inconsistent statements. There are numerous articles/studies that reveal that it is not unusual – and indeed typical – for sexual assault victims to give inconsistent statements. While your client is free to point out the inconsistencies, he (and you) should be aware that there is a contrary view.

(*Id.* ¶ 59.) Plaintiff alleges Defendant's impartiality is further demonstrated by its webpage providing the following advice on how to help a friend who has been sexually assaulted: "BELIEVE the survivor." (*Id.* ¶ 63.)

As a result of Defendant's investigation, Defendant issued a Notice of Charge letter to Plaintiff charging him with violating the Policy and "sexual assault and sexual misconduct at a Level 1 in violation of the Policy for conduct [he] . . . engaged in with the complainant . . . on October 18, 2015." (Notice of Charge (ECF No. 24-6).)[3] The Notice of Charge further informed Plaintiff that his charges were referred to the Office of Community Standards for a formal adjudication hearing (the "Hearing") by the Student Anti-Discrimination/Harassment/Sexual Assault/Sexual Misconduct Board (the "Board") to be held on December 4, 2015. (*Id.*)

### G. The Hearing

On December 4, 2015, a Hearing was conducted before a Board of three administrators, who reported directly or indirectly to Dean Campbell. (ECF No. 1 ¶ 74.) Plaintiff moved to recuse the three administrators on the board due to a conflict of interest because Dean Campbell had originally declared he was "going against" Plaintiff and suspended him. (*Id.* ¶ 6.) Defendant denied Plaintiff's request for recusal. (*Id.*)

Plaintiff alleges the Board's biases continued throughout the Hearing. "The Board vigorously and aggressively questioned [Plaintiff], while delicately questioning Jane Roe, Jane Roe 2, and their witnesses." (*Id.* ¶ 78.) Prior to and again at the Hearing, Plaintiff requested Jane Roe's medical records but Defendant did not provide him with those records. (*Id.* ¶ 79.) However,

---

[3] The Court may consider the Notice of Charge irrespective of it not being attached to the Complaint because it was "explicitly relied upon in the complaint." (ECF No. 1 ¶ 65); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (emphasis in original).

the Board allowed Jane Roe to testify as to her medical treatment following the incident, which according to her testimony demonstrates she was the victim of a sexual assault. (*Id.* ¶ 80.)

On December 8, 2015, in a one-page letter, the Board found Plaintiff responsible for sexual assault and expelled him from the University. (*Id.* ¶ 84.)

## H. The Appeal

Plaintiff appealed the Board's finding of responsibility and the sanction imposed. (*Id.* ¶ 85.) An appeal panel reviewed the record, and on January 8, 2016, upheld the Board's finding of responsibility and the sanction of expulsion. (*Id.* ¶ 86.) Plaintiff alleges a member of the appeal panel, Dr. James Castagnera, Esq., was not impartial because he quoted an administrator of the University in his blog speaking about the Defendant's Title IX process:

> "In order to remedy the lack of quick and effective resolution of sexual assault cases in our courts, the Department of Education [("DOE")] wants colleges and universities to do what the justice system can't . . . by lowering the standard of proof from 'beyond a reasonable doubt' to 'more likely than not,' and requiring that sexual assault investigations plus adjudications be completed in 60 days."
> . . . .
>
> "As I discovered earlier this year, when I dared, during supervisory training at a university, to criticize the due-process flaws in the campus-based system imposed by the DOE on sexual-assault investigations/adjudications, the attack dogs remain ready to slip their leashes against anyone with the temerity to come out openly against this latest American domestic 'war.'"

(*Id.* ¶¶ 94-95.)

## I. The Litigation

On August 10, 2016, Plaintiff filed a Complaint alleging eight counts: (1) Breach of Contract (Count I); (2) Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II); (3) New Jersey Consumer Fraud ("NJCFA") (Count III); (4) Promissory Estoppel and Reliance (Count IV); (5) Negligence (Count V); (6) Intentional Infliction of Emotional Distress (Count VI);

(7) Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* (Count VII); and (8) Declaratory Judgment (Count VIII). (*See* ECF No. 1) On March 13, 2017, Defendant filed a Motion to Dismiss. (ECF No. 23.) Plaintiff opposes the Motion. (ECF No. 25.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not

required, but "more than 'an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While as a general rule, a court many not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426 (emphasis in original).

**B. Federal Rule of Civil Procedure 9(b)**

Fraud based claims are subject to a heightened pleading standard, requiring a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). For a fraud based claim, a court may grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 9(b) if the plaintiff fails to plead with the required particularity. *See Frederico v. Home Depot*, 507 F.3d 188, 200-02 (3d Cir. 2007). The level of particularity required is sufficient details to put the defendant on notice of the "precise misconduct with which [it is] charged." *Id.* at 200 (citation omitted). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual

background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (citation omitted). The heightened pleading standard set forth in Rule 9(b) applies to Plaintiff's CFA and common law fraud claims. *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008) (applying Rule 9(b) to CFA and common law fraud claims).

### III.  DECISION

### A.  Title IX (Count VII)

Defendant argues Plaintiff's Title IX claim should be dismissed because he failed to sufficiently allege Defendant's actions, such as charging him with sexual assault and sexual misconduct, suspending him, and expelling him, were motivated by gender bias. (*See* ECF No. 23 at 10-19.) Plaintiff argues he sufficiently plead facts supporting a plausible inference of gender bias. (ECF No. 25 at 15-20.)

Title IX provides in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994)); *see A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 805 (3d Cir. 2007). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.*

Plaintiff's Complaint alleges Defendant receives federal funds (ECF No. 1 ¶ 139) and therefore may be held liable under Title IX. Indeed, Defendant does not dispute it must comply with Title IX. (*See* ECF No. 23.)

Although the Third Circuit has not analyzed Title IX in the context of university student disciplinary proceedings, courts have recognized that students subject to disciplinary proceedings may state Title IX claims under four theories: erroneous outcome, selective enforcement, deliberate indifference, and archaic assumptions. *Yusuf*, 35 F.3d at 715; *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003). Plaintiff contends he has adequately alleged three theories of Title IX claims against Defendant: erroneous outcome, selective enforcement, and deliberate indifference. (ECF No. 25 at 12-20.)[4]

An "erroneous outcome" claim is based on allegations that plaintiff "was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715. "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* However, "[i]f no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id.* "[T]he pleading burden in this regard is not heavy." *Id.* A complaint meets the pleading requirement if it alleges "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Id.* It may also allege procedural flaws affecting the evidence. *Id.* However, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome *combined* with a conclusory allegation of gender

---

[4] Defendant's Motion also addresses a fourth theory, "archaic assumptions," however Plaintiff's opposition clarifies it is only alleging Defendant violated the above three theories. (ECF No. 25 at 12-20.) Accordingly, the Court will not address "archaic assumptions."

discrimination is not sufficient to survive a motion to dismiss." *Id.* (emphasis added). "The fatal gap is . . . the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias. A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* Examples of allegations might include "statements by members of the disciplinary tribunal, statements by pertinent university officials, [] patterns of decision-making that also tend to show the influence of gender[,] . . . [or] statements reflecting bias by members of the tribunal." *Id.*

A "selective enforcement" claim asserts that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was *affected by the student's gender*." *Id.* (emphasis added). To state a "selective enforcement" claim, a plaintiff must "demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." *Mallory*, 76 F. App'x at 641; *see Curto v. Smith*, 248 F. Supp. 2d 132, 146–47 (N.D.N.Y. 2003) (dismissing a Title IX claim under *Yusuf* analysis for failure to state a selective enforcement claim where academically-expelled female sought to compare more favorable treatment of male who had been dismissed due to misconduct).

"The 'deliberate indifference' standard is applied where a plaintiff seeks to hold an institution liable for sexual harassment and requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Mallory*, 76 F. App'x at 638. Courts have found that, even under this theory, a plaintiff must allege that the complained of conduct was motivated by a gender bias. *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("A plaintiff must prove gender bias against the defendant under either theory of Title IX.") (citing 20 U.S.C. § 1681(a) (prohibiting discrimination "on the basis of sex")); *Doe v. Univ. of St. Thomas*, 240 F.

Supp. 3d 984, 990 (D. Minn. 2017) (same); *Doe v. The Trustees of the Univ. of Pa.*, No. 16-5088, 2017 WL 4049033, at *18 (E.D. Pa. Sept. 13, 2017) (same); *Sarvanan v. Drexel Univ.*, No. 17-3409, 2017 WL 4532243, at *7 (E.D. Pa. Oct. 10, 2017) (same).

Under each theory, in order to prevail, Plaintiff must allege the complained of conduct was motivated by a gender bias. 20 U.S.C. § 1681(a) (prohibiting discrimination "on the basis of sex"); *see Yusuf*, 35 F.3d at 715; *see also Mallory*, 76 F. App'x at 638 ("In *Yusuf*, the Second Circuit, analogizing from Title VII law, categorized Title IX claims against universities arising from disciplinary hearings into 'erroneous outcome' claims and 'selective enforcement' claims, both of which require a plaintiff to demonstrate that the conduct of the university in question was motivated by a sexual bias."); *Univ. of St. Thomas*, 240 F. Supp. 3d at 990; *Sahm*, 110 F. Supp. 3d at 778; *The Trustees of the Univ. of Pa.*, 2017 WL 4049033, at *18; *Sarvanan*, 2017 WL 4532243, at *7.

The Court finds Plaintiff's Complaint fails to plead sufficient facts to support a plausible inference that Defendant's conduct was motivated by gender bias to survive a Rule 12(b)(6) motion to dismiss. Because all Title IX theories require Plaintiff to allege Defendant's conduct was motivated by a gender bias, the Court need not probe into the theory-specific requirements necessary to state a claim for erroneous outcome, selective enforcement, or deliberate indifference claims. The Court will only analyze how Plaintiff failed to sufficiently plead Defendant's conduct was motivated by a gender bias.

Courts have found that specific allegations of procedurally flawed proceedings coupled with conclusory allegations of gender discrimination are not sufficient to survive a motion to dismiss. A plaintiff must also plead facts to support its allegation that gender bias was a motivating factor behind the defendant's actions. *See Yusuf*, 35 F.3d at 715 ("Allegations of a procedurally or

otherwise flawed proceeding that has led to an adverse and erroneous outcome *combined* with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. . . . A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.") (emphasis added); *Doe v. Baum*, 227 F. Supp. 3d 784, 817 (E.D. Mich. 2017) (finding procedural flaws alleged by the plaintiff were not sufficient to support his Title IX claim because he "offered nothing more than an administrative decision by school officials which he disagreed, and unelaborated allegations that the decision must have been due to 'gender bias,' essentially because he is male, the complainant is female, and the decision was adverse to him"); *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 792 (N.D. Ill. 2015) (finding plaintiff's allegations that "he was denied fair procedures during the investigation 'because he is male' is the kind of conclusory statement that courts reject as insufficient to plead this claim. . . . [T]he mere fact that [p]laintiff is male and Jane Doe is female does not suggest that the disparate treatment was because of [p]laintiff's sex."); *Prasad v. Cornell Univ.*, No. 15-322, 2016 WL 3212079, at *16 (N.D.N.Y. Feb. 24, 2016) (finding the plaintiff's allegations that the investigators intentionally misconstrued and misrepresented critical exculpatory evidence sufficient to cast doubt on the accuracy of the outcome of his disciplinary proceeding and that the plaintiff's allegations that a gender stereotype adverse to males charged with sexual assaults existed at Cornell causing such disciplinary proceedings to invariably end adversely to male accusers was sufficient to support gender bias); *Doe v. Washington & Lee Univ.*, No. 14-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (finding the plaintiff properly plead Title IX claims because he plead sufficient facts to cast doubt on the procedures of the proceedings against him *and* demonstrated the erroneous outcome of the proceedings was caused by gender bias through school official statements).

In *Columbia University*, the Second Circuit found the plaintiff's complaint sufficiently plead facts to support inferences of gender bias to support a Title IX claim. 831 F.3d at 56-59. The complaint alleged the investigator and the panel declined to seek out potential witnesses the plaintiff identified as sources of information favorable to him; the investigator and the panel failed to act in accordance with the university procedures designed to protect accused students; and the investigator, the panel, and the reviewing Dean, reached conclusions that were contrary to the weight of the evidence. *Id.* at 57. While the court found these allegations supported the inference of bias generally, they did not "necessarily relate to bias on account of sex." *Id.* However, additional allegations in the complaint, in addition to the above allegations, provided support for gender bias to sustain a Title IX claim. Namely, the complaint alleged:

> [D]uring the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.

*Id.* Based on these additional non-conclusory allegations, the court found plaintiff sufficiently alleged a gender bias.

Moreover, allegations of a bias against the alleged perpetrator in favor of the victim is insufficient to show an inference of gender bias. Indeed, courts have stressed that "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm*, 110 F. Supp. 3d at 778; s*ee Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016) (affirming dismissal of respondent's Title IX claim, finding alleged procedural deficiencies showing bias in favor of sexual assault complainants "do[] not equate to gender bias because

sexual-assault victims can be both male and female"); *see also Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination"); *Doe v. Regents of the Univ. of Cal.*, No. 15-02478, 2016 WL 5515711, at *5 (C.D. Cal. July 25, 2016) (dismissing the plaintiff's Title IX claim because "the Court [could not] plausibly infer, as Plaintiff does, that a higher rate of sexual assaults committed by men against women, or filed by women against me, indicates discriminatory treatment of males accused of sexual assault in the consequent proceedings"); *King v. DePauw Univ.*, No. 14–70, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males, even if all of the students accused of assault were male). Courts have also found that a plaintiff's allegation that the university "needed to believe the victim" "does not sustain the inference that [the university] took the genders of the victim and accused into account." *Ludlow*, 125 F. Supp. 3d at 793. *ees of the Univ. of Pa.*, 2017 WL 4049033, at *18; *Sarvanan*, 2017 WL 4532243, at *7.

Here, comparing the factual allegations in the Complaint to the above case law, the Complaint does not plead sufficient facts to demonstrate Defendant's conduct was motivated by gender bias. Plaintiff has not alleged that any of the University administrators, Public Safety Officers, the community standards panel, the board, or the appeals panel made statements indicating gender bias, which Courts have found sufficient to demonstrate gender bias. *Yusuf*, 35 F.3d at 715. Dean Campbell's statement, "I'm going against you," does not refer to Plaintiff's sex or demonstrate a bias against Plaintiff on the basis that he is a male. (ECF No. 1 ¶ 6.) Instead, it demonstrates Dean Campbell's bias in favor of the alleged victim of sexual assault, and against Plaintiff (the alleged perpetrator), which is not the equivalent of demonstrating bias against male

students or pleading gender bias. *Sahm*, 110 F. Supp. 3d at 778. Furthermore, Dr. Castagnera's blog post discussing fundamental due process flaws in Defendant's sexual assault policies in procedures does not refer to Plaintiff's sex, demonstrate a bias against Plaintiff on the basis that he is a male, or discuss gender. (*Id.* ¶¶ 94-95.) Defendant's webpage stating, "BELIEVE the survivor" and Defendant's references to accusers as "victims" in its materials only further demonstrates a bias in favor of the alleged victim, not gender bias. (*Id.* ¶ 63.)

Further, Plaintiff has not alleged any patterns of decision-making, which Courts have also found sufficient to demonstrate the influence of gender bias. *Yusuf*, 35 F.3d at 715. While Plaintiff has sufficiently plead he was treated differently throughout the proceedings, that the proceedings were flawed, and that he was punished severely, he has failed to demonstrate how the flaws or mistreatment are casually connected to his gender. *Yusuf*, 35 F.3d at 715. He has also failed to plead other circumstances demonstrating Defendant has made decision-making due to gender bias influences. Instead, Plaintiff makes conclusory and unsupported allegations that "[Defendant's] procedurally deficient process is deliberately designed to subject male students as a group to less favorable treatment than female students because accused students in sexual assault cases are overwhelmingly, if not always, male." (ECF No. 1 ¶ 150.) "Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome *combined* with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.* (emphasis added).

Plaintiff argues the Complaint provides a concrete example of disparate treatment based on gender at the University by deciding to charge Joe Doe 2, instead of Jane Roe with sexual assault, "despite the fact he was clearly the more intoxicated of the two." (ECF No. 25 at 19.) The

Court cannot accept this allegation to support Plaintiff's Title IX claim because Plaintiff does not allege Joe ever sought to file a complaint against Jane Roe 2 and was prevented from doing so.

Contrary to Plaintiff's contentions, this case is materially distinguishable from *Prasad* and *Collick v. William Paterson Univ.*, No. 16-471, 2016 WL 6824374 (D.N.J. Nov. 17, 2016), *reconsideration denied*, 2017 WL 1508177 (D.N.J. Apr. 25, 2017). In *Prasad*, the court held the plaintiff's complaint "plausibly establishe[d] a causal connection between gender bias and the outcome of his disciplinary proceeding." 2016 WL 3212079, at *17. The court based its holding on a consideration of the totality of the circumstances, which included, unlike here, the plaintiff's allegation that "a gender stereotype adverse to males charged with sexual assaults existed at Cornell causing such disciplinary proceedings to 'invariably' end adversely to male respondents." Here, while Plaintiff generally alleges "[Defendant's] procedurally deficient process is deliberately designed to subject male students as a group to less favorable treatment than female students because accused students in sexual assault cases are overwhelmingly, if not always, male" (ECF No. ¶ 150), he does not allege Defendant has had a history with gender bias.

In addition, the Court finds this case is not only distinguishable from *Collick*, but that courts are split on whether allegations along the lines of *Collick*—that due to pressure from the U.S. Department of Education's Office for Civil Rights ("OCR"), men accused of sexual assault are invariably found guilty—pass muster under *Iqbal* and *Twombly*. *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 186 (D.R.I. 2016).

> Put another way, absent any female comparators at the pleading stage, is the allegation that schools are concerned about appearing too lenient on male students accused of sexual assault, and therefore those students are systematically found guilty regardless of the evidence, a factual allegation—which must be credited—or a conclusory legal allegation—which does not get the presumption of truth.

*Id.*; *see Columbia Univ.*, 831 F.3d at 57–58 (plaintiff alleged that the university was motivated "to accept the female's accusation of sexual assault and reject the male's claim of consent," to publicly demonstrate its seriousness "about protecting female students from sexual assault by male students" in order to counteract severe criticism by students and the press that it had previously tolerated sexual assault of female students); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) ("[Plaintiff's] allegations show Defendants were reacting against him, as a male, to demonstrate to the OCR that Defendants would take action, as they had failed to in the past, against males accused of sexual assault.").

In *Collick*, the Court found the plaintiffs sufficiently plead a Title IX claim because they plead the accuser's allegations against the male plaintiffs were accepted as true without any investigation being performed and without the development of any facts or exculpatory evidence. 2016 WL 6824374 at 11. The complaint further pled the plaintiffs were not given the opportunity to respond or explain themselves, did not receive proper notice of the specific charges, were not permitted to confront or cross-examine the accuser, were not provided with the list of witnesses against them, and generally were not afforded a thorough and impartial investigation. *Id.* The Court further took into consideration the plaintiffs' briefs which argued "that universities were under pressure to make a show of compliance with Title IX following a [OCR] 'Dear Colleague Letter' in 2011." *Id.* at 12. It found that the letter was "no more than a commonsense inference that the public's and the policymakers' attention to the issue of campus sexual assault may have caused a university to believe it was in the spotlight." *Id.* Ultimately, the Court concluded, "At the pleading stage, . . . an allegation that the process was one-sided, irregular, and unsupported by evidence *may* give rise to an inference of bias." *Id.* at 11 (emphasis added).

Here, unlike in *Collick*, the Complaint does not allege the proceedings were entirely one-sided. In fact, Plaintiff's Complaint alleges both Jane Roe and Plaintiff were interviewed by Public Safety Officers and the Police Department, that Defendant's held an investigation (albeit it not being in accordance with the Policy), and that Plaintiff "presented his case before the community standards panel." (ECF No. 1 ¶¶ 35-36, 50, 52-53.) Therefore, the cases are factually distinguishable, and the Court finds the facts in *Collick* to be more egregious. Accordingly, Plaintiff's Complaint does not give rise to an inference of gender bias. To the extent Plaintiff suggests the OCR "Dear Colleague Letter" in 2011 generally alluded to in the Complaint, induced Defendant to discriminate against male students in sexual misconduct cases, that allegation on its own is insufficient to demonstrate an inference of gender bias without further allegations that the process was either one-sided as seen in *Collick* or that Defendant had some history with gender bias as seen in *Columbia University*, *Wells*, and *Prasad*. *Columbia Univ.*, 831 F.3d at 57. *Wells*, 7 F. Supp. 3d at 751; *Prasad*, 2016 WL 3212079, at *16. In addition and of significance, courts are split on whether allegations along the lines of those in *Collick* satisfy the strictures of *Iqbal* and *Twombly*. *Brown Univ.*, 166 F. Supp. 3d at 186. As such, while the Court has found factual differences between the cases and need not decide whether or not to follow *Collick's* legal conclusions at this time, it is important to note such law is not binding, precedential, or the majority.

In *Wells*, the plaintiff alleged he was falsely accused of sexual assault against a female student by Xavier and that he was wrongly expelled after a flawed disciplinary proceeding. 7 F. Supp. 3d at 747–48. He further alleged the charges against him and the disciplinary hearing arose in the context of an investigation conducted by the U.S. Department of Education's Office of Civil Rights regarding how Xavier handled previous sexual assault allegations. *Id.* at 747. Lastly, he

alleged Xavier "made him into a scapegoat" to demonstrate to the OCR that it would respond better to sexual assault allegations. *Id.* The district court agreed with the plaintiff's argument that his allegations were sufficient to state an erroneous outcome Title IX claim insofar as he alleged Xavier had "react[ed] against him, as a male, to demonstrate to the OCR that [Xavier] would take action, as [it] had failed to in the past, against males accused of sexual assault." *Id.* at 751. Here, Plaintiff does not allege Defendant reacted against him, as a male, to demonstrate it would respond better to sexual assault allegations, as it had failed to in the past, against males accused of sexual assault.

Therefore, the Court finds Plaintiff has failed to sufficiently plead Defendant's conduct was motivated by gender bias to survive a Rule 12(b)(6) motion to dismiss. Accordingly, Defendant's Motion to Dismiss Plaintiff's Count VII is **GRANTED without prejudice**.

### B. Breach of Contract (Count I)

Defendant argues Plaintiff's breach of contract claim should be dismissed for failure to identify any specific policy provision that was breached. (ECF No. 23 at 20-22.) Defendant does not contest, but instead concedes, valid contracts exist between the parties, the Policy and The Source. (ECF No. 23 at 29.) Plaintiff argues his Complaint "spends paragraphs and pages citing to The Source and the Policy, quoting extensively from the sections that the University alleged to have breached, and chronicling the specifics of the University's many and repeated breaches." (ECF No. 25 at 23.)

Under traditional contract principles, "[a] party alleging a breach of contract satisfies its pleading requirement if it alleges (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (citations omitted).

The Third Circuit has found New Jersey courts have recognized students may also bring "viable breach-of-contract type claims against public universities." *McMahon v. Salmond*, 573 F. App'x 128, 132 (3d Cir. 2014) (citing *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 696–97 (N.J. Super. Ct. App. Div. 1998)). Specifically, in *Mittra*, the court found "courts may intervene where the institution violates in some substantial way its rules and regulations pertaining to student dismissals." 719 A.2d at 698. However, the court rejected "the rigid application of contractual principles to university-student conflicts involving academic performance and limiting [its] scope of review to a determination whether the procedures followed were in accordance with the institution's rules and regulations." *Id.* at 697. Therefore, when a student asserts a contract claim, a court must determine "whether the procedures followed were in accordance with the institution's rules and regulations." *Mittra*, 719 A.2d at 697.

Read in the light most favorable to Plaintiff, the Complaint sufficiently alleges Defendant breached at least two provisions of its policies and procedures. The Complaint alleges the Policy requires "a trained investigator or investigators to promptly, fairly and impartially investigate the complaint," but that Detective Eggert, was neither fair nor impartial. (ECF No. 1 ¶ 54.) Specifically, Plaintiff alleges:

> Detective Eggert assembled a summary affidavit detailing Jane Roe's and Jane Roe 2's allegations. The affidavit parroted Jane Roe's and Jane Roe 2's statements to the [Police Department] and completely ignored the girls' earlier—and contradictory—statements to Public Safety, the office out of which Detective Eggert himself works. . . . He simply accepted wholesale Jane Roe's and Jane Roe 2's revised and changed statements without exercising a critical or inquiring eye.

(*Id.* ¶ 55.)

In addition, Plaintiff alleges Defendant breached a provision of the Policy stating, "The Board will be composed of three (3) impartial and trained, professional staff members of the

University community appointed by the Title IX Coordinator (or designee)." (*Id.* ¶ 73.) Specifically, he alleges:

> Just days before the December 4 formal hearing, [he] learned that the three designated Board members all reported, either directly or through others, to Dean Campbell. This was a clear conflict of interest. It was Dean Campbell who had urged Jane Roe and Jane Roe 2 to make a report to the [Police Department]. It was Dean Campbell who had suspended [Plaintiff] on October 19, 2015. It was Dean Campbell who had summarily declared that he was "going against" [Plaintiff]. And, on information and belief, it was Dean Campbell who had directed the community standards panel to continue [Plaintiff's] interim suspension.
>
> . . . .
>
> Despite this clear conflict of interest, [Defendant] failed to recuse any of the Board members.

(*Id.* ¶¶ 74-76.) Therefore, Plaintiff has sufficiently pled procedures were not followed in accordance with the institution's rules and regulations. *Mittra*, 719 A.2d at 697. Accordingly, Defendant's Motion to Dismiss Plaintiff's Count I is **DENIED**.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant argues Plaintiff's breach of the implied covenant of good faith and fair dealing "fails because it is based on the same fatally flawed allegations underlying Plaintiff's breach of contract claim." (ECF No. 23 at 22.) Plaintiff argues the Complaint provides a "standalone" claim for breach of the implied covenant of good faith and fair dealing. (ECF No. 25 at 24.) Specifically, he argues that "[s]eparate and apart from the specific breaches of The Source and the Policy, [Plaintiff] alleges that [Defendant], from the outset, acted to prevent him from realizing the expected benefits of the two contracts." (*Id.*) At the beginning of his suspension, he was told Defendant would abide by The Source and the Policy, but Dean Campbell deprived him of the benefits of those contracts by purposefully "going against" him. (*Id.* at 24-25.)

Pursuant to New Jersey law, all contracts have an implied covenant of good faith and fair dealing, which prohibits either party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Fields v. Thompson Printing Co.*, 363 F.3d 259, 270 (3d Cir. 2004) (citations omitted); *see Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395-96 (N.J. 2005); *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132, 1145-46 (N.J. 2001). "A plaintiff may be entitled to relief under the covenant [of good faith and fair dealing] if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 267 (3d Cir. 2008) (quoting *Brunswick Hill Racquet Club, Inc.*, 864 A.2d at 396; *Graco, Inc. v. PMC Global, Inc.*, No. 08-1304, 2009 WL 904010 (D.N.J. 2009) ("A defendant who acts with improper purpose or ill motive may be found liable for breaching the implied covenant if the breach upsets the plaintiff's reasonable expectations under the agreement."). "In New Jersey, a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract." *Hahn v. OnBoard LLC*, No. 09–3639, 2009 WL 4508580, at *6 (D.N.J. Nov. 16, 2009) (citing *Wade v. Kessler Inst.*, 798 A. 2d 1251, 1259–60 (N.J. 2002)).

Plaintiff's Complaint repeatedly alleges that on October 19, 2015, Dean Campbell suspended Plaintiff and told him he was "going against" him. (ECF Nos. 1 ¶¶ 1, 6, 58.) On that same day, Plaintiff was also provided him with copies of the Policy and The Source and told Defendant would abide by them. (ECF Nos. 45-46.) Dean Campbell's declaration, at this stage of the litigation, is sufficient to demonstrate Defendant's ill motives without any legitimate purpose

to deprive Plaintiff of the fruits of the contracts. Accordingly, Defendant's Motion to Dismiss Count II is **DENIED**.

### D. CFA (Count III)

Defendant argues Plaintiff's CFA claim should be dismissed for failure to plead with particularity or to plausibly allege causation. (ECF No. 23 at 23-25.) Plaintiff argues the Complaint "clearly satisfies" the requirements of Federal Rule of Civil Procedure 9(b) because it explains how Plaintiff was falsely accused. (ECF No. 25 at 26.) He further contends the facts explaining how he was falsely accused "paint a sufficiently clear story to provide Defendant with notice of its misconduct." (*Id.*) Lastly, Plaintiff argues he sufficiently alleged a causal connection between Defendant's unlawful conduct and his loss because he only decided to challenge the false charges against him because of the assurances in The Source and the Policy that the procedures would be fair. (*Id.* at 27.)

The CFA states, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; . . . .

N.J.S.A. § 56:8-2. Courts have interpreted this section to require the following three elements to state a cause of action under the CFA: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009) (citing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1087 (N.J. 2007)).

An "unlawful practice" is defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

N.J.S.A. 56:8-2. "The [CFA] creates three categories of unlawful practices: affirmative acts, knowing omissions, and violations of state regulations." *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 499 (D.N.J. 2009) (quoting *Vukovich v. Haifa*, No. 03-737, 2007 WL 655597, *9 (D.N.J. Feb 27, 2007) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994))). Affirmative acts require no showing of intent on behalf of the defendant. *See Cox*, 647 A.2d at 462; *Fenwick v. Kay Am. Jeep, Inc.*, 371 A.2d 13, 16 (N.J. 1977). "Thus, a defendant who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence or the intent to deceive." *Vukovich*, 2007 WL 655597, at *9 (citation omitted). "In contrast, when the alleged consumer fraud consists of an omission, a plaintiff must show that the defendant acted with knowledge, thereby making intent an essential element of the fraud." *Id.*

"The third category of unlawful acts consists of violations of specific regulations promulgated under the [CFA]." *Cox*, 647 A.2d at 462. "In those instances, intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations." *Id.* (citation omitted). Unlawful acts expressly regulated by other statutes, regulations, or rules not promulgated under the CFA can give rise to a CFA claim. *See Henderson v. Hertz Corp.*, No. L-6937-03, 2005 WL 4127090, at *5 (N.J. Super. Ct. App. Div. June 22, 2006); *Lemelledo v. Beneficial Mgmt.*

*Corp. of Am.*, 696 A.2d 546, 552-56 (N.J. 1997). However, the CFA does not create strict liability for violations of other statutes, regulations, or rules not promulgated under the CFA. *See Henderson*, 2005 WL 4127090, at *5.

An "ascertainable loss" is one that is "quantifiable or measurable." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 793. (N.J. 2005). A "plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical." *Bosland*, 964 A.2d at 749. Courts support alleged damages based on an out-of-pocket theory or a benefit of the bargain theory. *See Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99-103 (D.N.J. 2011); *Thiedemann*, 872 A.2d at 792. "An out-of-pocket-loss theory will suffice only if the product received was essentially worthless." *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 374 (D.N.J. 2015). "A benefit-of-the-bargain theory requires that the consumer be misled into buying a product that is ultimately worth less than the product that was promised." *Id.* (citation omitted).

Additionally, plaintiffs must set forth allegations sufficient to show those losses are causally connected to defendant's alleged conduct. *Bosland*, 964 A.2d at 749. It is not sufficient to make conclusory or broad-brush allegations regarding defendant's conduct; plaintiff must specifically plead those facts. *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, No. 08-1057, 2008 WL 5381227, at *7 (D.N.J. Dec. 17, 2008). This requires, for example, pleading when and to whom the alleged fraudulent statements were made. *See Dewey*, 558 F. Supp. 2d at 527.

The Court finds Plaintiff's Complaint fails to meet the Federal Rule of Civil Procedure 9(b)'s particularity requirements. The heightened pleading standard set forth in Rule 9(b) applies to Plaintiff's CFA and common law fraud claims. *Dewey*, 558 F. Supp. 2d at 524. Pursuant to Rule 9(b), the level of particularity required is sufficient details to put the defendant on notice of the "precise misconduct with which [it is] charged." *Frederico*, 507 F.3d at 200. At a minimum, Rule

9(b) requires a plaintiff to allege the "essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 276-77.

Plaintiff's Complaint merely alleges:

> 45. Whenever there is an allegation of sexual misconduct on [Defendant]'s campus, the investigation and, if necessary, adjudication of that allegation is governed by the Policy. [Plaintiff] was provided with a copy of the Policy at the time of his suspension and was told—repeatedly throughout the process—that [Defendant] would abide by the Policy and afford him all of the rights and protections included therein. [Plaintiff] relied on those representation and promises.

> 46. [Plaintiff] was also provided with a copy of [Defendant]'s student handbook, The Source, at the time of his suspension and was told—then and repeatedly throughout the process—that [Defendant] would abide by The Source and afford him all of the rights and protections included therein. [Plaintiff] relied on those representations and promises.

> . . . .

> 117. [Defendant] has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances:

>> a. by causing [Plaintiff] to believe that [Defendant] would follow the Policy and The Source, copies of which were provided to [Plaintiff] and are also available on [Defendant]'s website; and

>> b. by causing [Plaintiff] to believe that if he paid tuition an fees to [Defendant], that [Defendant] would uphold its obligations, covenants, and warranties to [Plaintiff] described in the Policy and The Source.

(ECF No. 1 ¶¶ 45-46, 117.) These allegations fail to identify who provided Plaintiff with the Policy and The Source, who made the alleged misrepresentations, and when they made these alleged

"repeated" misrepresentations. Although the Complaint alleges Plaintiff was provided with the Policy and The Source after his suspension, it does not specify when he was told or promised Defendant would abide by the polices. Because, at a minimum, Rule 9(b) requires a plaintiff to allege "the 'who, what, when, where and how' of the events at issue," *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 276-77, and Plaintiff fails to do so in the Complaint, Defendant's Motion to Dismiss Plaintiff's Count III is **GRANTED without prejudice**.

### E.  Promissory Estoppel and Reliance (Count IV)

Defendant argues Plaintiff's promissory estoppel claim should be dismissed for failure to identify a clear and definite promise. (ECF No. 23 at 25.) Plaintiff argues the Complaint alleges a clear and definite promise, "John was provided with a copy of the Policy at the time of his suspension and was told—repeatedly—that [Defendant] would abide by the Policy. John relied on those representations and promises." (ECF No. 25 at 27 (quoting ECF No. 1 ¶ 45 and citing ECF No. 1 ¶ 46).)

In New Jersey, the elements of a promissory estoppel claim are "(1) a clear and definite promise' (2) made with the expectation that the promisee will rely on it (3) reasonable reliance; and (4) definite and substantial detriment." *Cotter v. Newark Hous. Auth.*, 422 F. App'x 95, 99 (3d Cir. 2011) (quoting *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cty. of Burlington*, 944 A.2d 1, 19 (N.J. 2008)).

Plaintiff's promissory estoppel claim fails to plead a "clear and definite promise." A clear and definite promise is "the *[s]ine qua non* for [the] applicability of [promissory estoppel]." *Malaker Corp. v. First Jersey Nat'l Bank*, 395 A.2d 222, 230 (N.J. Super. Ct. App. Div. 1998). Plaintiff's promissory estoppel claim, much like his CFA claim, relies on his allegations set forth in paragraphs 45 and 46 of the Complaint. (ECF No. 25 at 27.) As explained above, those

paragraphs and the rest of the Complaint are devoid of any specific allegations regarding who communicated the alleged promise and when the "repeated" promise was made. *See Taylor v. Lincare, Inc.*, No. 15-6284, 2016 WL 3849852, at *12 (D.N.J. July 15, 2016) (dismissing promissory estoppel claim where the plaintiff did "not allege when or by whom the communications and assurances were made or the substance of the alleged assurances"); *Zhejiang Rongyao Chem. Co. v. Pfizer Inc.*, 2012 WL 4442725, at *6 (D.N.J. Sept. 21, 2012) (dismissing promissory estoppel claim where complaint was "devoid of any specific allegations regarding who communicated the alleged promise . . . , when and where it was made, or what the specific parameters of the promise were."). Accordingly, Defendant's Motion to Dismiss Count IV is **GRANTED without prejudice**.

### F. Negligence (Count V)

Defendant argues the New Jersey Charitable Immunity Act and the economic loss doctrine bar Plaintiff's negligence claim. (ECF No. 23 at 27-29.) Plaintiff concedes he only pled negligence in the alternative to its contract claim, in the event this Court found no valid contract existed. (ECF No. 25 at 30.) Because Defendant concedes the Policy and The Source are valid contracts, and the Court finds Plaintiff has pled sufficient facts to sustain a breach of contract claim at this stage of the litigation, Count V is **DISMISSED** and Defendant's Motion to Dismiss Count V is **MOOT**. (ECF No. 23 at 29 and ECF No. 25 at 30.)

### G. Intentional Infliction of Emotional Distress (Count VI)

Defendant argues Plaintiff's Complaint contains no allegations supporting a plausible claim that defendant engaged in "extreme and outrageous" conduct to support his IIED claim. (ECF No. 23 at 30.) Specifically, it argues, "Courts have held that purported errors in the sexual assault disciplinary process cannot support IIED claims against universities." (*Id.* at 31.) Plaintiff

argues he has sufficiently pled Defendant engaged in "extreme and outrageous conduct." (ECF No. 25 at 28-29.) Plaintiff argues he "does not cry foul due to the 'vigorous investigation and adjudication' of the allegations against him . . . or due to the 'various procedural errors' in his disciplinary hearing," but "objects to the complete lack of investigation of the claims against him." (ECF No. 25 at 28.)

To establish a prima facie claim for intentional infliction of emotional distress in New Jersey, a plaintiff must show: "(1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe." *Witherspoon v. Rent-A-Center, Inc.*, 173 F. Supp. 2d 239, 242 (D.N.J. 2001) (citing *Buckley v. Trenton Saving Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988)). "To establish extreme and outrageous conduct, a plaintiff must show conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Buckley*, 544 A.2d at 863 (citation omitted)). One will not satisfy the above elements by merely demonstrating a defendant acted "unjust, unfair, and unkind." *Id.*

Here, Plaintiff has failed to sufficiently allege Defendant engaged in "outrageous conduct." Plaintiff alleges Defendant's failure to sufficiently investigate the claims against him, disregard for the procedures and policies, and failure to provide Plaintiff a meaningful opportunity all contributed to Defendant's outrageous conduct. (ECF No. 25 at 28.) The Court does not agree. Courts have found that when a university takes action in response to a claim of sexual assault made by another student, such conduct fails to meet the standard of "outrageous." This Court agrees. *See Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 895 (N.D. Ohio 2017) ("Because it is undisputed that Wooster took the action it did against plaintiff in response to a claim of sexual assault lodged

by another student, the alleged conduct in this case fails to meet this demanding standard."); *Fraad–Wolff v. Vassar Coll.*, 932 F. Supp. 88, 93–94 (S.D.N.Y.1996) (finding the college's handling of investigation and hearing of sexual harassment charges against student did not support an IIED claim.); *Fellheimer v. Middlebury College*, 869 F. Supp. 238, 247 (D. Vt. 1994) ("A college's decision, when confronted with a female student's accusation of rape, to confront male student with the charges, hold a hearing, and support the findings of the tribunal on appeal cannot form the basis of an IIED claim, even if various procedural errors are alleged by the plaintiff.") Because it is undisputed Defendant took the action it did against Plaintiff in response to a claim of sexual assault lodged by another student, the alleged conduct in this case fails to meet the level of "outrageous conduct." According, Defendant's Motion to Dismiss Count VI is **GRANTED without prejudice**.

### H. Declaratory Judgment (Count VIII)

Defendant argues Plaintiff's declaratory judgment claim should be dismissed because it is a remedy, not an independent cause of action, and Plaintiff's other causes of action also fail. (ECF No. 23 at 32.) Plaintiff concedes "[t]he Declaratory Judgment Act requires an actual controversy between the parties before a federal court may exercise jurisdiction." (ECF No. 25 at 30.) However, he argues that because the Court should deny Defendant's Motion to Dismiss, its declaratory judgment claim should stand. (*Id.*)

Because Plaintiff's breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II) claims will proceed at this time, Defendant's Motion to Dismiss Plaintiff's declaratory judgment (Count VIII) claim is **DENIED**. *See Weaver v. Wilcox*, 650 F.2d 22, 25 (3d Cir. 1981) ("[T]he [Declaratory Judgment] Act empowers a federal court to grant the

remedy only when there is already an actual controversy, based on independent jurisdictional grounds, before the court.").

**IV. CONCLUSION**

      For the reasons set forth above, Defendant's Motion to Dismiss Plaintiff's breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II) and declaratory judgment (Count VIII) claims are **DENIED**. Count V (Negligence) is **DISMISSED** and Defendant's Motion to Dismiss Count V is **MOOT**. Defendant's Motion is **GRANTED without prejudice** as to all other respects. Plaintiff may file an amended complaint by no later than February 16, 2018.

Date: January 17, 2018                 ***/s/ Brian R. Martinotti***_____
                                          **HON. BRIAN R. MARTINOTTI**
                                          **UNITED STATES DISTRICT JUDGE**